Good morning, Your Honors. May it please the Court, my name is Mary Ann Dugan. I represent the appellant in this case, Colleen Clemente. And I would like to reserve three minutes for rebuttal. The Court erred as a matter of law in dismissing both the EPA Title 7 pay discrimination claims and the retaliation claims, where there was sufficient evidence to go to the jury on those claims. On the Equal Protection Act pay discrimination claim, as the District Court correctly found, ER 193, the plaintiff made out a prima facie case of pay discrimination. We do dispute with the District Court that the two employees who did not make it through their probationary period are appropriate comparators. However, even if they are appropriate comparators, looking at the totality of their experience and background, the Court was wrong in finding that the comparators had superior experience. The District Court did basically find that Mr. Nagy himself had superior experience, and we do argue that he is the only appropriate comparator. He started at pay level 3, the plaintiff started at pay level 1. The problem with the Court's finding on that ---- Well, that was on summary judgment, right? Correct, Your Honor. There were no findings. That's correct, Your Honor. I'm sorry. I misspoke. The Court did state that Mr. Nagy had superior experience to the plaintiff, and that is incorrect. There was certainly sufficient evidence to go to the jury disputing that fact. The Court allowed the defendant to rely ---- As I recall, Mr. Nagy had time. He was hired. He was working as a corrections hearing officer. I forget which county it was. Multnomah? Correct. He had eight months of experience as a corrections hearings officer with the Multnomah County Sheriff's Office. Correct. So he had been conducting hearings, and he ---- I can't remember if he was actually a lawyer. I think he was. He just hadn't practiced law. He had failed the bar three times. He had never been an attorney.  The basic requirements for their job were either a law degree or a bachelor's degree with courses in law and one year of experience conducting contested case hearings, or three years of experience conducting contested case hearings. Didn't the job announcement say that preference will be given to those applicants who have experience conducting hearings in a correctional environment? Preference in hiring. And there's no dispute that both Mr. Nagy and Ms. Clemente had the basic requirements for the job, the basic qualifications. Ms. Clemente, as we explained in our reply brief, did have corrections hearing ---- I'm sorry, hearings background, not corrections hearing background. Was that a difference, though? Did they say they wanted corrections hearing background? They did not say that in the basic requirements for the job. The basic requirements for the job were either a law degree or law experience or three years of experience conducting contested case hearings. But a clear preference mean? There was a preference in hiring where if ---- I would presume that would mean if there was a tie between two candidates, whether to hire them or not, that the tie would go to the person with corrections training. This is not a question about whether she should have been hired or not. She was hired. But doesn't that reflect that from the beginning of the process, there was a premium put on a correctional hearing office experience? You know, I would submit that that would be a very hotly disputed issue of fact for a jury. Because this was on summary judgment, there has not been a full fact-finding trial on what premiums are put on what backgrounds. The defendant's proffered explanations have varied wildly over time, and the corrections experience was only recently raised compared to earlier statements. But at that point, it would be the obligation of the plaintiff to show that the reasons that were offered were pretextual. And if even before the controversy arose, there is evidence showing that there was a preference for correctional officer hearing experience or hearing experience in the correctional environment, wouldn't that be evidence that doesn't raise the material question of fact regarding whether this was a preference even in the beginning of the hiring process? Well, I think that to have, number one, minimum qualifications, and then to state there's a hiring preference for people with some corrections experience does not say anything at all about what those people should be paid. The pay should, by the defendant's own varied reasons that they submitted, should be based on experience and salary history and a bunch of other factors. With the defendant first pointing to salary history and then that being rebutted, they then start to turn to the corrections experience. Then they said he was an attorney, which he was not. And then they even said there was the desire of the employer to have him work for us, so that's why we gave him more money. And he was able to negotiate a higher salary, but they never gave Ms. Clemente that same opportunity to negotiate a higher salary, when she had 15 years as an attorney. Was he making a higher salary in his role at the county? No, he was not. That was stated at one point. But in deposition, he admitted that he actually had made slightly less at his prior position. Slightly less than what? Than his Department of Corrections pay. He was not making more directly before he was hired. Was he making more than Ms. Clemente was making when she accepted the position? Was he making more? At his previous job than Ms. Clemente was making at her previous job. She moved to Oregon after being an attorney for 15 years, making over $100,000 in many years. Then she was a law clerk for a few months. And, yes, her pay as a law clerk, the job immediately preceding the corrections job, was lower than Mr. Nagy's pay. Mr. Nagy's pay at the county, higher than the starting salary as a hearings officer for the state? I believe it was slightly higher. It was slightly higher, yes. But as this Court has explained, the Court should be very careful in using salary history as the deciding factor in whether it's permissible to pay men more than women because then it can be a self-fulfilling prophecy to, if men traditionally have a higher salary history, and then we keep up the rate. Is there any evidence in the record about the number of women hearing officers and what their salaries were versus men? No, Your Honor. There is only a record of the comparators, the male comparators. You started off by saying that we should not consider the — the only comparator we should consider is Mr. Nagy. But why is that? The two other comparators — The claim here is the starting, you know, what they started at, the salary they started at. And that's the pay that was perpetuated after the promotions period. And the people that the defendant would have you compare her to did not make it through their promotions period. What difference does that make if you're comparing starting salaries? The starting salary was perpetuated after her probation period. That's not — it was her starting official salary after the probation period. Mr. Nagy was started at pay scale 3 after his probationary period. So we're talking about people who were hired and did not make it through their probationary period and also did not — I don't understand that argument. So what you're saying, at the end of the probationary period, she should have gotten a higher pay rate? She should have been bumped up? She — I don't understand why these fellows who didn't make it through their probationary period drop out. Because Mr. Nagy was started at the third level and stayed at the third level. Ms. Clemente started at the first level and stayed at the first level. She made it through probation. These folks who started at the first level and were not even good enough to make it through the probationary level should not be compared to her because they didn't — they weren't good enough to make it. And this Court has stated that people who don't — not this Court, I apologize. The Sixth and Eighth Circuits have said that comparators should not include people who didn't make it through their probationary period. I see that I'm just about out of time. I'll give you some time for rebuttal. Thank you very much. Good morning, Your Honors. Keith Bauer on behalf of the State of Oregon. May it please the Court, I'd like to just touch on that last area that you were exploring with the felons' counsel, and that is this question of the probationary period. I had trouble following the argument, but I believe that the statement was made that the probationary period and then the salary was set after that. I don't know that that's anywhere in this record, nor have I heard that argument made before. In fact, the starting salary with respect to the individuals and the comparators were that Mr. Nagy had prior hearing experience, and he was working for Multnomah County at a salary of $3,450 a month with the opportunity for overtime beyond that, and that when he was hired with the State of Oregon, he was hired at Step 3 at $3,500 a month approximately. That Ms. Clemente, the appellant in this case, had worked as a law clerk in Douglas County, and when she was hired with the State of Oregon as a hearings officer, she didn't have the prior experience in corrections hearings at all like Mr. Nagy did, and she was hired at Step 1, which was about $3,269 a month. That's a 33% increase over what she was earning as a law clerk when she worked in Douglas County prior to coming to work for the state as hearings officer. But also the other two comparators that were hired near the same period of time, Mr. Klein was hired in 1999. He had a number of years prior experience as a hearings officer in corrections, but did not have a college degree. He was hired at Step 1, the same as Ms. Clemente. And Mr. Lumsden, who was hired in, I believe it was the summer of 2001, he was an attorney. He was a law school graduate. He was an attorney. He practiced a number of years at the Public Defender's Office, handled criminal matters, handled hearings, handled court of appeals arguments, Supreme Court arguments, and was hired at Step 1, the same as Ms. Clemente when he was hired. And coming back again to Mr. Nagy, Mr. Nagy did have the experience as a corrections hearings officer before. And that's why the court noted all of these comparables and said it was appropriate to look at all four of these individuals in taking a look at the salaries that were awarded. Did Mr. Nagy have more than eight months' experience? I'm not clear about the ratio. How much experience did he actually have? He had eight months' experience as a hearings officer in corrections. Prior to that, he had worked in investigations with the sheriff's office in corrections for, I think, it was a couple years. He also had an undergraduate degree in criminology and criminal justice in his undergraduate degree also. So he was definitely an individualist focused in the criminal system and then focused subsequently in the corrections system. And that's why he was of Dickensian was hired. What role did Mr. Scroggham play in setting salaries? He was part of the hearing group. There were three individuals, I believe, in the interview process. I'm not quite sure the exact number, but more than Mr. Scroggham. And he was the one that made the contact to the individuals to say, you're hired, this is what your salary is going to be. And it's interesting if we look at, and I might move to the next issue, is with respect to whether or not there's retaliation. There's two basic claims here by the appellant. One is the equal pay issue, which you've explored at some length. The other issue is the issue of whether or not there was retaliation. And there's no question that the appellant did file a complaint with Borley. But then the four areas that she claims for retaliation are specifically the area that the appellant was asked to sign a timesheet in front of some male co-employees. This was at a general meeting. It was at a break. The timesheet was put down on the table. It just said, can you please sign it? There's no indication that even the individual male employees saw her signing it. The second issue was that other employees were paid for one and a half hour travel time to a meeting. And excuse me, the appellant was paid one and a half hours travel time to a meeting. The others were paid two hours. She complained it was immediately corrected as soon as it was brought to the attention that should be two hours. The third issue was, well, I mentioned this, Mr. Scroggum being promoted. And clearly the court went through that analysis and looked at the facts there and said it was clearly a business decision. We had a hearings officer supervisor for Eastern Oregon, one for Western Oregon. And Mr. Scroggum was put over both positions. The interesting thing is the fourth area that the appellant was raising was that this issue of whether or not she was foreclosed from visiting her new office in Salem. Now, again, each time the appellant was given all pay raises that came up, she was basically requests were met that she had except for this one request. And that was that she wanted to travel from Eastern Oregon to Salem to attend a hearings officer's meeting. In the past, she had attended those by video conferences. Other hearings officers in Eastern Oregon did. And that's how they attended those meetings. But she said, I'm going to be moving down. And, in fact, that's because she had asked to be transferred from Eastern Oregon to the valley, down to Salem, to the Oregon State Prison. And that request had been granted. But she wanted to come down and take seven or eight hours of travel time to come down and look at her new office that she would be going into in about six weeks. It wasn't Mr. Scroggum that denied that request. It was Mr. Schumacher who had been the supervisor on the western half of the state. And, again, I point out the fact that the complaint of the appellant was Mr. Scroggum was placed over the state as a whole to supervise hearings officers. But, in fact, the big issue that she got all upset about was Mr. Schumacher was going to be her – she thought was going to be her new supervisor. It wasn't in the end because Mr. Scroggum was put over the whole state. And, in fact, it's Mr. Schumacher that said, no, wait a minute. You're going to incur seven to eight hours of overtime, travel expense to the state, purely for you to go down and look at your new office in Salem. We don't think this is appropriate. And she then went down on her own time, took vacation time, and then wanted to attend the hearing in person there. And they said, wait a minute. You're on vacation. How can we – you know, you're supposed to be on vacation. We're going to honor the vacation request. But why should you be attending the meeting?        You're going to incur seven to eight hours of overtime, travel expense to the state, be it no different than anyone else being on vacation. Those are the four issues that are the retaliation issues, which we would submit to this Court. The district court properly said no on the retaliation account. I think the district court said they don't amount to an adverse employment action. That's right. It was. Those are the main points I wanted to make. I'd be glad to respond to any other questions of the Court. One last question. How long was the probationary period for the two fellows that didn't make it? I honestly don't know the answer to how long it was. We've always focused on the fact of at the point of hiring. In fact, I would mention that the Hein case, which we cited in our brief, involved Oregon College of Education. And the court in that case stated that the question of whether two jobs are substantially equal is one that must be decided on a case by case basis. Review that finding under the clearly erroneous standard. And that case also stands. We cited in the brief for the fact that you look at the person at the time of hiring. The two cases that were cited by the appellant from other circuits suggesting you should look at the probationary period, one of those, as I recall, involved a union situation where there's a probationary union issue as it affected a union matter. It wasn't an equal pay case. The second one involved bus drivers and that they had to ensure that they could drive the bus. And that was clearly a condition of even beginning to serve the job itself. And so I would suggest that neither of those cases cited by the appellant are really on point to this case. Is there anything in the record reflecting why these two individuals did not complete the probationary period? No, there's not. There's a comment by the appellant about termination, but there's nothing in the record I can recall that specifically said why they didn't complete the probationary period. We acknowledge they didn't complete it. Thank you for your time. Thank you. Just a few points. The issue regarding the preference for prior corrections experience, it is, as I've explained in the brief, it wasn't listed as a requirement for the job. And the Equal Pay Act 29 CFR 1620.15a says that the court should not consider skills that are not necessary for the job, for necessary requirements for the job. This was a preference but not a requirement. The eight months' corrections is not sufficient enough time to be a superior amount of experience. If you compare with the Stanley case from this court, this court held that 14 years' difference in a publishing background history were superior. This is certainly at least an issue of fact for the jury. As far as the amount of pay and who had authority over that, in Ms. Clemente's case, Mr. Scroggins told Ms. Clemente that she could not negotiate her pay. In contrast, Mr. Nagy was allowed to negotiate and obtained two steps higher than her. And I see that my time is now counting up. Thank you very much, Your Honors. And I ask that you reverse the Court. Okay. Thank you. We appreciate your arguments, and the matter will be submitted. We had another case, Devine v. Smurfett, but that's off calendar, and so we'll go next to McClarence v. the U.S. Environmental Protection Agency.
judges: Paez, Rawlinson, Collins